**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 24 CR 503-2 |
| | ) | The Hon. Matthew F. Kennelly, |
| RAMONE BRADLEY, | ) | *Judge Presiding* |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT BRADLEY'S SENTENCING MEMORANDUM**</u>

In accordance with Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. §3553(a), as well as the Sixth Amendment of the United States Constitution and the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220 (2005), Ramone Bradley ("Ramone") respectfully requests a sentence of 60 months, followed by a four-year term of supervised release.

Such a sentence will be sufficient but not greater than necessary to achieve the goals listed in 18 U.S.C. §3553(a)(2). It also aligns with the limitations of 18 U.S.C. §3582(a), which states that "courts, in determining whether to impose a term of imprisonment, [shall recognize] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §3582(a).

**I.  INTRODUCTION**

A sentencing memo usually highlights how the prosecution is pivotal, marking the defendant's transformation into someone *expected* to change. In this case, the arrest itself was the main turning point. The carjacking occurred in November 2022.

Although initially arrested then, Ramone was released the following day and was not charged again until September 3, 2024, when he faced charges in state court.

Over nearly two years, he built a life typical of a law-abiding citizen. He kept steady employment, started a family, and took care of their well-being. He stayed out of trouble and met all Indiana probation requirements. Essentially, Ramone was already making important progress toward rehabilitation long before he would face charges in this case.

Ramone's life reflects a history of poverty, instability, and limited support, but also resilience and hope. Growing up in public housing on Chicago's South Side, he often lacked basic necessities. With no father present, his mother tirelessly cared for her five children, yet his childhood was filled with hardship and deprivation. Experiences of bullying, social isolation, and continuous violence left lasting scars, shaping his self-image and perspective on life.

Throughout, he has demonstrated strong determination and resilience. Despite facing setbacks, he joined youth programs and graduated high school with good grades. He avoided gangs and drugs. He supported his small family through work. As he grew older, he looked for ways to give back to his community, especially as a "peacekeeper," mentoring youth and helping them avoid the mistakes he had made.

Having experienced life without a father and knowing the pain that absence can bring, Ramone is determined to break that cycle for his own child. (He appreciates the furlough the court allowed). His regret over the harm caused and the time he'll

2

miss in his child's life fuels his commitment to change. His custody experience has led to meaningful personal growth, motivating him to maintain this progress via therapy, rehabilitation, and ongoing self-development.

Ramone understands that a serious punishment is warranted in this situation. However, his past does not determine his current character. Fundamentally, Ramone is a good individual who simply made a bad choice. He asks for a sentence that recognizes his positive traits, growth, and true potential, while also ensuring accountability and offering the best opportunities for his future success.

## II. CORRECTIONS/CHANGES TO THE PRESENTENCE INVESTIGATION REPORT

The Presentence Investigation Report ("PSR") includes several statements that need clarification or correction. First, the PSR states that records from the Metropolitan Correctional Center (MCC) do not show Ramone's reported role as an observer in the facility's suicide prevention program. (PSR ¶7). That is incorrect. He has requested and awaits documentation of his participation in this program.

Second, the PSR indicates that Ramone's involvement in the current offense was linked to his alleged membership in the Gangster Disciples street gang. (PSR ¶9). Ramone has never been a member of the Gangster Disciples or any street gang, now or in the past. His conduct was not motivated by any gang affiliation. (PSR ¶82).

The PSR indicates that Ramone's fingerprints were discovered on a Glock 19 handgun discarded during Singleton's escape, which was later recovered. *(PSR ¶12)* Singleton was photographed with this gun on the night of the incident and was

3

convicted of possession (Count V). Ramone's fingerprints were only on the tape attached to the magazine, not directly on the firearm.

## III.  THE STATUTORY FACTORS

Section 3553(a) directs this Court to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing set forth by Congress. 18 U.S.C. §3553(a)(2). To fashion the sentence, 18 U.S.C. §3553(a) directs this Court to consider:

- The nature and circumstances of the offense, as well as the history and characteristics of the defendant (§3553 (a)(1));

- The need for the sentence to (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (§3553(a)(2));

- The kinds of sentences available (§3553 (a)(3));

- The sentencing guideline range (§3553 (a)(4));

- Any Sentencing Commission policy statements (§3553 (a)(5));

- The need to avoid unwarranted sentencing disparities among defendants with similar records who engaged in similar conduct (§3553 (a)(6)); and

- The need to provide restitution. (§3553 (a)(7)).

The guidelines are one of many factors the Court must consider when imposing a sentence. *See United States v. Booker*, 543 U.S. 220, 259 (2005). They carry no greater weight than any other factor. The §3553 factors "are broad, vague, and open-

ended," leaving the sentencing judge with "considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with §3553(a)." *United States v. Wachowiak,* 496 F.3d 744, 748 (7th Cir. 2007); *abrogated on other grounds by Nelson v. United States*, 555 U.S. 350 (2009).

A.   **SECTION 3553(a)(1): THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Section 3553(a)(1) provides that the offending conduct should be considered alongside the defendant's history and characteristics. 18 U.S.C. § 3553(a)(1). One must view the defendant's role in the offense and try to understand them as a person, evaluating their criminal conduct in light of how they have otherwise lived their lives.

1.   **The Nature and Circumstances of the Offense**

Since a trial has been conducted in this case, further explanation of the offense's nature and circumstances is unnecessary.

2.   **The History and Characteristics of the Defendant**

*a.* **Personal History**

Ramone was born on June 12, 1998, and grew up in the Auburn-Gresham and Chatham neighborhoods on Chicago's South Side. His childhood was marked by severe poverty (PSR ¶71). Raised by his single mother, who faced difficulties supporting her six children amid unstable employment, he lived with his five other siblings. Their early years were tough, often relying on Section 8 housing and frequently struggling to pay for food and utilities. The family found holiday seasons especially hard (PSR ¶¶ 68, 71).

Ramone grew up without a paternal figure. His biological father from Detroit was mostly absent, frequently incarcerated during Ramone's childhood, offering no support or guidance. Before Ramone's arrest, he tried to connect with his father, but those attempts did not succeed, and they never formed a meaningful relationship. Since Ramone's incarceration, they have not spoken. Ramone met his paternal siblings only once, at his half-sister's funeral—she was murdered on a CTA train. She was the only paternal relative with whom Ramone had a close relationship. *(PSR ¶68).*

During his presentence investigation interview, Ramone unexpectedly described his childhood as "great" and a "nice lifestyle," despite recognizing that his neighborhood faced issues like violence, shootings, murders, and kidnappings. (PSR ¶70).

These characterizations do not fully represent his upbringing. His account is subjective and shows difficulty in discussing painful memories. When he tries to honestly talk about his childhood trauma, his disclosures are often used against him, leading to hesitation in sharing his struggles.

Growing up overweight, he wore ill-fitting clothes that classmates noticed. When he mentioned that his family couldn't afford new clothes, he anticipated sympathy but was bullied. These early experiences influenced his self-image and underscored the challenges of his developmental years.

Ramone continued to face childhood bullying that grew more intense and harsher as he got older. His feelings of loneliness and resentment towards classmates

6

made him hide his struggles behind a facade of "just fine," which became harder to sustain over time. Lacking support or resources, when he grew, he ultimately had to resort to physical self-defense against his bullies.

This response had significant consequences: Ramone was expelled from high school for fighting and lost his place on the football team, the only environment where he felt a sense of belonging. Nonetheless, Ramone demonstrated resilience by persisting with his education and earning his high school diploma. Even in difficult situations, his actions outside this case show a person dedicated to persevering and making positive choices despite challenges.

Ramone abstains from alcohol and only started taking illegal pills after being shot.

Traumatic events have significantly impacted Ramone's life, which is one of the reasons he would never fire a gun. Shortly after his half-sister's death in a train crash, he was at a White Castle on the south side with his older cousin. As he was about to walk home, he saw a group of men arrive, exit with guns, and open fire through the restaurant windows. They shot Ramone's cousin and killed his best friend.

Soon after, while riding in a car with a friend, gang members drove by, reversed, and fired about twelve shots at them. Ramone was wounded in the leg, and his friend, who was shot multiple times, died right in front of him. He believes they were targeted because they had been mistaken for different people.

His experiences have strengthened his determination to end the cycle of poverty, instability, and trauma that have shaped much of his life. Ramone is engaged to a young woman with whom he has had a dedicated relationship for most of his adulthood, and they are raising a baby together. She attended every day of his trial. He is a caring and involved father and has also played a role in raising her son from a previous relationship since he was an infant. (PSR ¶74-75)

Ramone feels a strong sense of parental duty and a deep desire to provide his children with a safer, more stable life than he experienced. These feelings motivate him to avoid repeating past mistakes. While he knows he cannot change what happened before, he believes he can influence his future and his family's welfare. His time in custody has given him space and a new perspective for growth. He values accountability and strives to build a stable foundation for those who depend on him. Although missing his child's early years saddens him, his regret fuels his determination. He sees his sentence not as an end but as an opportunity to turn his life around. Ramone is dedicated to emerging from incarceration ready to be a dependable, loving parent.

During his time in custody, Ramone has continued to show progress. He is beginning to understand that the world isn't necessarily against him, and that his perspective—shaped by trauma, poverty, and hardship—does not have to determine his future. Ramone is eager to begin therapy as part of his sentence, which will equip him with vital tools to process his past, address the underlying causes of his behavior, and work toward a healthier, more positive future. Making therapy a condition for

8

his release would be a more effective rehabilitation strategy than simply prolonging his incarceration.

Letters of support are attached in Group Exhibit A.

### b. Education, Programs, and Work Experience

As a child, Ramone's mother kept him busy by enrolling him in park district programs and the Boys and Girls Club. He found joy in camping, fishing, and sports, which gave him a sense of normalcy and structure despite a tough upbringing. Ramone was particularly talented in football, where teamwork and camaraderie helped him feel connected and purposeful.

During his teenage years, he stayed active with the Boys and Girls Club, taking part in their summer programs and earning a small wage. In 2022, he secured a job at Amazon, ensuring a stable income (PSR ¶108). This followed his initial arrest and release by the Chicago Police Department related to this case (PSR ¶63). After Amazon relocated him, he was unable to continue working there and subsequently found employment at Wal-Mart *(PSR ¶62).*

*Before his arrest, Ramone served as a community 'peacekeeper' in Chicago, patrolling neighborhoods and mentoring at-risk youth (PSR ¶61).* He is deeply troubled by the thought of letting down the young people who once looked up to him because of this arrest. This burden weighs heavily on him and continually reminds him of the person he aspires to be.

Academically, Ramone earned good grades and graduated from Excel Academy of Roseland. (PSR ¶73).

### B.  SECTION 3553(a)(2): THE GOALS OF SENTENCING

Section 3553(a)(2) states that the sentence must provide just punishment, reflect the seriousness of the offense, promote respect for the law, provide adequate deterrence, protect the public, and provide the defendant with needed treatment, vocational and educational training, or other correctional treatment.

In this case, the sentencing objectives would be met through a 60-month sentence and four years of supervised release. 18 U.S.C. §3582.

## C.    §3553(a)(4): THE SENTENCING GUIDELINES RANGE

The first step in sentencing a defendant is correctly calculating the applicable guideline range. *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 169 L.Ed. 2d 445 (2007); *United States v. Vrdolyak*, 593 F.3d 676, 678 (7th Cir. 2010). After doing so, the court is entitled to disagree with the results of the guideline calculation and even categorically reject the Sentencing Commission's policy choices. *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840, 843-44, 172 L.Ed. 2d 596 (2009); *United States v. Aguilar-Huerta*, 576 F. 3d 365, 446-67 (7th Cir.), cert. denied, 130 S. Ct. 811, 175 L. Ed. 2d 596 (2009).

### 1.  The Offense Level Computation

### ¶ 24-Pointing a Firearm at Victim A

Paragraph 24 of the PSR assigns six offense-level points because it states that "Defendant Davis pointed a firearm at Victim A." This description accurately reflects the trial evidence regarding Davis's actions. (PSR ¶24). However, it appears the enhancement was mistakenly associated with Ramone, as the trial evidence did not indicate that Ramone brandished a firearm toward Victim A.

Finally, ¶¶ 105, 107, and 108 incorrectly referred to Bradley as Davis.

10

## **¶¶ 21-22 and ¶¶ 29/36-Objection to the Base Offense Calculations**

In Count I, Bradley was charged with Conspiracy to Commit Carjacking, in violation of 18 U.S.C. 371. Both underlying carjackings that were charged in the indictment were included within the conspiracy count. Citing Guideline § 1B1.2(d), the PSR (¶¶ 21-22) treats Bradley's convictions as if he had been convicted of both substantive carjackings, "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." The commentary cautions, "4. Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense." See also, *United States v. Jett*, 982 F.3d 1072, 1077 (7th Cir. 2020).

Bradley was not separately charged with the first carjacking. This was a deliberate decision by the government. Consequently, he was denied the opportunity for a jury to determine beyond a reasonable doubt whether he committed the offense. He objects to receiving points as if he committed the substantive offense and to getting enhancements for certain aspects, because doing so denies him the right to have a jury determine beyond a reasonable doubt whether he engaged in criminal conduct that affects his sentence. *Shepard v. United States*, 544 U.S. 13, 24, 125 S.

Ct. 1254, 1262 (2005) ("Any fact other than a prior conviction sufficient to raise the limit of the possible federal sentence must be found by a jury."); *Erlinger v. United States*, 602 U.S. 821, 839-40, 144 S. Ct. 1840, 1854-55 (2024) ("In particular, a judge may not use information in *Shepard* documents to decide 'what the defendant . . . actually d[id],' or the 'means' or 'manner' in which he committed his offense in order to increase the punishment to which he might be exposed. 579 U. S., at 504, 510-511, 136 S. Ct. 2243, 195 L. Ed. 2d 604; see also *Descamps v. United States*, 570 U. S. 254, at 269, 133 S. Ct. 2276, 186 L. Ed. 2d 438. To sanction that practice would be to allow a sentencing court to do exactly what the Fifth and Sixth Amendments forbid. Ibid."); *United States v. Grimes*, No. 22-3195, 2024 U.S. App. LEXIS 31024 (7th Cir. Dec. 2, 2024).

Bradley recognizes that the guideline calculation for conspiracy should follow the underlying crime, which remains the calculation for carjacking. The correct calculation for count I should be:

| | |
|---|---|
| Base Offense Level § 2B3.1 plus if there are enhancements (maybe only 20) | 28 |
| Adjustment for Acceptance of Responsibility | -3 |
| 2X1.1b(2)  If a conspiracy, decrease by 3 levels | -3 |
| Adjusted Offense Level | 22 or 14 |

For count 2, 2X1.1(b) states, "If an attempt, decrease by 3 levels, unless the defendant completed all the acts the defendant believed necessary for successful

completion of the substantive offense…" Three more points should be deducted from the ultimate adjusted offense level in ¶ 36.

### ¶ 33-Objection to a Vulnerable Victim Enhancement § 3A1.1(b)(1)[1]

Section 3A1.1(b)(1) of the Guidelines calls for a two-level enhancement if the defendant "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The commentary defines a vulnerable victim as a person who is "(a) a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (b) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2. Application Note 2 of the enhancement advises that the adjustment would apply "in a robbery in which the defendant *selected* a handicapped victim." *Id.* (emphasis added). Here, the vehicle was selected, not the person.

The PSR suggests that the enhancement applies to Bradley because Victim B's crutches and braces would have been visible when the defendants approached him. PSR ¶ 33. However, no evidence indicates that Victim B was chosen due to his vulnerability.

The defendants intended to steal luxury cars, regardless of who was driving. Singleton had messages saying so. Victim A, who was large, physically fit, and appeared healthy, did not show any signs of vulnerability. There's no evidence

---

[1] Bradley understands that Davis raised similar objections. But Bradley should not be estopped by the Davis rulings.

indicating he was selected due to any specific weakness, and the text messages and related materials do not discuss targeting vulnerable individuals.

Additionally, the claim that victim B was selected because of his disability conflicts with the government's assertion that, if there had been resistance, the defendant would have used his firearm to inflict serious injury or death. If the victim was vulnerable and targeted because stealing their car was easier, there would be no need to use a firearm or have the intention to cause greater harm if there was resistance. If his selection was due to his disability, it would have made resistance difficult for the victim, negating the need to inflict serious harm or cause death. Claiming that the victim was chosen because he was vulnerable undermines the theory of intent and the verdict.

### ¶ 35-Objection to the Reckless Endangerment Enhancement §3C1.2

Section 3C1.2 of the Guidelines allows for a two-level increase if a defendant recklessly created a substantial risk of death or serious bodily injury to another person while fleeing law enforcement. U.S.S.G. § 3C1.2, Application Note 5, states that defendants are responsible for their actions and for conduct they helped or abetted, counseled, commanded, induced, procured, or intentionally caused.

The probation officer writes that "The defendants engaged in a dangerous vehicle flight and did not abide by traffic laws," and "In addition, Defendant Bradley discarded his loaded firearm in the garage of a residence." PSR ¶ 35. Neither of these reasons justifies a two-level increase for reckless endangerment.

14

Participating in an armed robbery with a getaway vehicle does not warrant an increase for reckless endangerment during flight. In *United States v. Seals,* the court wrote: "Although this is a matter of first impression before this court, every circuit to consider the issue has concluded that, in the context of a car chase, 'some form of direct or active participation ... is necessary for the enhancement to apply to a passenger.'" *United States v. McCrimon*, 788 F.3d 75, 79 (2d Cir. 2015); see also *United States v. Byrd*, 689 F.3d 636, 640 (6th Cir. 2012) ("To apply this enhancement to a passenger based on the driver's reckless conduct, the district court must specifically find that the passenger 'was responsible for or brought about the driver's conduct in some way.' (quoting *United States v. Young*, 33 F.3d 31, 32-33 (9th Cir. 1994)).") *United States v. Seals*, 813 F.3d 1038, 1046-47 (7th Cir. 2016) (footnote: when a defendant is merely a passenger, the prosecution needs to demonstrate that the individual did more than just willingly join the pursuit; they must also show that the defendant played a role in influencing or contributing to the driver's actions in some way.

This situation requires some degree of direct or active participation. Bradley was evidently merely a passenger, with no information to suggest otherwise. Singleton was the person driving the getaway car, and there is no proof that Bradley helped, assisted, or advised. Any assumption that he did so would be purely speculative. Similarly, while Singleton appeared to realize at some point that the police were tracking the vehicle, it remains unclear when he became aware. Usually, when the helicopter observes the vehicle, Singleton adheres to traffic laws and avoids

15

reckless driving. As a result, even if he was trying to evade the police, no high-speed or dangerous chase endangered anyone.

With respect to the firearm, "[i]t is of course true that simply leaving a weapon in a public place can amount to reckless endangerment." *United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003). But mere evidence that a defendant discarded a loaded firearm in a residential area and then ran away does not always amount to reckless endangerment during flight. *See United States v. Mukes*, 980 F.3d 526 (6th Cir. 2020). The view and the accessibility of the firearm matter. A common theme of importance is whether the firearm is discarded and found in plain view. *See, e.g., United States v. Brooks*, 100 F.4th 825, 834 (7th Cir. 2024) (the court recognizing that while the police only had to trace the defendant's short flight path to recover the gun, his actions still created a substantial risk because the firearm was lying in plain view); *United States v. Brown*, 314 F.3d 1216, 1221 (10th Cir. 2003) (where the fleeing defendant dropped his handgun outside an apartment complex in front of children getting off a school bus).

Bradley did not recklessly create a substantial risk of death or serious injury when he relinquished the firearm in a residential area while being pursued by law enforcement, per Section 3C1.2. The weapon was not left in a public place in plain sight; it was concealed in a fenced backyard, an area inaccessible and not visible to the public. It was not placed somewhere with a high likelihood of being found.

## Bradley Should Receive Acceptance Points

Accepting responsibility is typically granted only to defendants who do not go to trial. However, in this rare case where the defendant chose to proceed to trial, he should be awarded two points for acceptance of responsibility. This is because Bradley challenged a legal issue in his defense. He did not deny being present, possessing a firearm, participating in the conspiracy, or being involved in an armed robbery. He merely pointed out that he would not have caused significant bodily injury or death, and pointed out that he did not have his finger on the trigger. He did not contest the facts; only one of the two required mental states.

Application note 2 advises: "Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." 18 U.S.C.S. app. § 3E1.1.

His only contest was over one aspect of the mental state required to establish the offense.

Carjacking requires evidence that the offender intended to cause serious bodily harm or death if there was initial resistance. Bradley went to trial because he

believed the statute did not cover his mental state, which clearly involved committing a robbery but did not include the intent to cause serious harm or death.

In *United States v. Gauvin*, 173 F.3d 798, 806 (10th Cir. 1999), the court held that it was not clearly erroneous too award acceptance of responsibility where the defendant disputed whether his state of mind met the legal criteria for the required intent to commit the particular crime:

> Our decision rests in part on the fact that Mr. Gauvin went to trial only to contest the legal element of intent.
>
> The Sentencing Commission has indicated that the guideline should not apply to "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true . . ." USSG § 3E1.1, comment. (n.1(a)). However, the Commission notes that it may apply where the defendant "challenges . . . the applicability of a statute to his conduct." Id., comment. (n.2). Mr. Gauvin admitted to all the conduct with which he was charged. He simply disputed whether his acknowledged factual state of mind met the legal criteria of intent to harm or cause apprehension.
>
> While a jury disagreed with Mr. Gauvin's defense that he lacked the requisite intent to commit the crime, that does not undermine the good faith in which the district court found this defense was asserted. See Rec. vol. VII, at 8-9. Here, Mr. Gauvin argued that he did not intend, while drunk and scared, to cause injury to others. Further, he contended that his drunkenness rendered him incapable of forming the requisite *mens rea*. This defense - essentially a challenge to the applicability of the statute to his conduct, see USSG § 3E1.1, comment. (n.2) - does not as a matter of law preclude application of the guideline.

In *United States v. Fells*, 78 F.3d 168, (5th Cir.), cert. denied, 519 U.S. 847 (1996), the Court reversed the denial of acceptance, noting that the defendant did not dispute the facts during trial. Instead, he only questioned whether those facts established proper venue within the district.

Bradley did not cross on the facts; he only challenged whether they supported the dual mental state. He accepted responsibility for his actions and did not deny committing a crime, but he contested whether his actions met the level of misconduct alleged by the government. This situation warrants earning two points for accepting responsibility, even when he chose to go to trial.

### 2. The Defendant's Criminal History

Ramone is classified under the criminal history category I. He received one point for an Indiana theft conviction when he was 21. That is his only criminal conviction. Although he had a hiccup along the way, he successfully completed probation after a violation was filed.

### D.    §3553(a)(5): THE KINDS OF SENTENCES AVAILABLE

District courts should impose a sufficient sentence but one that is not greater than necessary to meet the sentencing objectives. 18 U.S.C. §3553(a); *see Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840 (2009). In this case, the sentencing goals can be reached with the proposed sentence and two years of supervision. Ramone does not oppose the proposed conditions for supervised release, although he lacks the means to satisfy a fine.

### E.    3553(a)(6): THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES.

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records that have

been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Supreme Court has clarified that a sentencing court can examine a co-defendant's sentence while conducting its disparity analysis. *Gall v. United States*, 528 U.S. 38 (2007). The Seventh Circuit "recently reaffirmed that our court is 'open in all cases to an argument that a defendant's sentence is unreasonable because of a disparity with the sentence of a co-defendant,' though we recognized that 'such an argument will have more force when a judge departs from a correctly calculated Guidelines range to impose the sentence.' *United States v. Sanchez*, 989 F.3d 523, 541 (7th Cir. 2021), quoting *Statham*, 581 F.3d at 556." *United States v. Moore*, 50 F.4th 597, 604 (7th Cir. 2022).

Defendant Davis actively participated in two carjackings, exiting the vehicle, brandishing a weapon, and attempting to enter or entering the stolen vehicle each time. He also faced a mandatory minimum sentence of seven years, with a guideline range of 252 to 294 months, including that minimum. The court imposed a 144-month sentence, which is 57% of the lower end of the recommended range. Assuming all of Bradley's objections are denied, the lower end of the guideline range is 151 months, with an alternative downward sentence of 86 months (57%). If the court accepts Bradley's objection and grants a 2-point reduction, the lower end adjusts to 121 months, making a corresponding sentence of 69 months. Depending on the court's decision on other objections, the minimum could further be reduced to 97 or 78 or 57 months.

Bradley acknowledges that Davis had no previous felony conviction and did not go to trial, but he does not believe this should significantly affect the comparison.

## IV. CONCLUSION

The events that have led to this point are unfortunate. But a sentence of 60 months, followed by two years of supervised release, will be sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

Respectfully submitted,
Ramone Bradley, Defendant

*s/ Steven Greenberg*
One of the Defendant's Attorneys

**Steven A. Greenberg**
**Nicholas Burris**
**GREENBERG TRIAL LAWYERS**
**53 W. Jackson Blvd., Ste. 315**
**Chicago, IL 60604**
**(312) 879-9500**
**Steve@GreenbergCD.com**
**Nick@GreenbergCD.com**